**AL–JUTHOOR CONTRACTING COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 14–5C

United States Court of Federal Claims.

Filed: April 30, 2016

Joseph A. Yolofsky, Yolofsky Law, Miami, FL for plaintiff.

Martin M. Tomlinson, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With him were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, Commercial Litigation Branch, Department of Justice and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Department of Justice.

Contract Disputes Act; Partial Motion to Dismiss; Failure to State a Claim; Statute of Limitations; Equitable Tolling; Lack of Subject Matter Jurisdiction.

## OPINION

HORN, J.

### FINDINGS OF FACT

Plaintiff, Al–Juthoor Contracting Company, (Al–Juthoor), filed its original complaint in this court, alleging that defendant, the United States, had breached a contract between the parties by failing to pay plaintiff for work performed by plaintiff in furtherance of the contract. Alleging jurisdiction in this court is proper pursuant to the Tucker Act, 28 U.S.C. § 1491 (2012), and the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 7103 (2012), plaintiff requested damages on seven, separate claims in its original complaint, totaling $7,127,393.00 for the "changes, delays, interruptions, and extra repairs required to complete the contract." In plaintiff's amended complaint, the damages sought were increased to a total amount of $8,061,647.00, in addition to an unspecified amount for a claim of the breach of the covenant of good faith and fair dealing. Plaintiff also seeks attorney's fees and court costs. According to plaintiff, this action was filed after the contracting officer failed to respond to plaintiff's certified claims within 60 days of the submission of a demand letter pursuant to 41 U.S.C. § 7104(b)(1) (2012) and 48 C.F.R. § 52.233–1(c).

Plaintiff asserts that the United States Army Corps of Engineers (Army Corps) awarded plaintiff task order 004 of Contract W916–QW–04–D–0014 (the contract) on September 18, 2004. Pursuant to the contract, plaintiff was to "construct and secure [a court] facility necessary to establish the rule of law in Iraq within the budgeted design/build amounts," in the Al–Karkh neighborhood of Baghdad. Included within the contract was a Statement of Work which provided, "[t]he exact spot where the judicial facility will be built will be determined by PCO [the Procuring Contracting Officer]." Furthermore, the Statement of Work laid out the project requirements, including civil site

work, exterior/interior security needs, design criteria for the electrical power distribution system, how debris was to be removed, heating and air conditioning ventilation systems, plumbing, and other special requirements. Although the courthouse was scheduled to be completed by June 30, 2006, plaintiff alleges that a number of "difficulties arose during the course of the construction that delayed completion."[1] In its amended complaint,[2] plaintiff indicates that construction was not completed, the courthouse was not handed over to the Iraqi government, and total contract performance was not completed until December 17, 2007.

Plaintiff's first alleged "difficulty" involved defendant's delay in obtaining the required clearances for plaintiff to proceed with construction. Plaintiff maintains that defendant sent a Notice to Proceed on April 14, 2005, after which, time plaintiff began mobilizing its workers and equipment. Plaintiff asserts, however, that it could not begin construction on April 14, 2005, because the Iraqi Council of Judges had not yet authorized construction to begin. Plaintiff alleges that it did not request permission to begin construction from the Council of Judges because defendant instructed plaintiff that only the defendant could coordinate with the Council of Judges. On April 26, 2005, while awaiting approval, plaintiff claims it received a modification to the contract to build a "safe house" in the vicinity of the courthouse. Also on April 26, 2005, plaintiff claims it received a second[3] Notice to Proceed. According to plaintiff's amended complaint, on May 21, 2005, "the Iraqi COJ [Council of Judges] approved the commencement of work on the courthouse" and the "Army Corps' sent the

third Notice to Proceed to Al–Juthoor in a letter from Daniel Hanas, Contracting Officer." During the 37–day period between when the first and third notices to proceed were issued, plaintiff maintains it was forced to keep its equipment and personnel at the construction site, and was unable to undertake any replacement or additional work, because "at all times during this delay period, [plaintiff] was fully mobilized to begin work." The amended complaint claims that the overhead costs caused by the delay totaled $682,860.00.

Plaintiff's second alleged "difficulty" involved defendant's decision to relocate the site of the courthouse from the originally designated site. Although defendant appears to have retained the site responsibly under Statement of Work § 1.1, which states "[t]he exact spot where the judicial factory will be built will be determined by PCO [the Procuring Contracting Officer]," when the relocation order was issued, plaintiff claims it had already performed a site survey for the originally designated location, which cost $85,000.00. Plaintiff claims it then had to conduct a new site survey, at an additional expense of $85,000.00. Plaintiff maintains that "it is entitled to recover the costs it incurred in response to these directives from the PCO." Furthermore, plaintiff claims that at the new location, the courthouse increased in size, which required "significantly more fill and grading to prepare for construction." Plaintiff estimates the costs associated with the additional fill and brick work at $1,490,766.00.[4] Plaintiff also claims a new mobilization area had to be created. Although Statement of Work § 5.7 states that "[a] mobilization area will be provided" for plain-

1. Plaintiff sometimes uses the term "difficulties" in lieu of the word "claims."

2. Plaintiff filed its amended complaint with this court on September 15, 2015, after defendant raised jurisdictional defenses to plaintiff's original complaint and the parties were permitted by the court to search for additional, relevant documents to the above captioned case. After discovery of some additional documents, plaintiff sought additional time to search for potentially relevant documents which were located in Cyprus. After plaintiff was unable to locate any more documents, plaintiff filed its amended complaint.

3. In its filings with the court, plaintiff refers to the April 26, 2005 Notice to Proceed as the "third" Notice to Proceed. Chronologically, it appears to have been the second, and the May 21, 2005 Notice to Proceed was the third. As indicated above, the First Notice to Proceed was issued on April 14, 2005.

4. According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for additional fill and grading totaled $582,286.00. Elsewhere, however, the costs for additional fill and grading are listed as $1,376,880.00.

tiff's use, defendant allegedly directed plaintiff to obtain a new mobilization area, which plaintiff did, at a cost of $5,000.00/month. Plaintiff maintains it also incurred additional expenses to build the necessary office facilities in that space. Plaintiff claims defendant was made aware of these additional expenses via email on November 27, 2005. Plaintiff's complaint alleges that, as a result of defendant's decision to change the construction site's location, plaintiff incurred $1,869,038.00 in total, additional expenses.[5]

Plaintiff's third alleged "difficulty" involved defendant's delay in approving security upgrades to the courthouse mandated by the United States Marshals. In December 2005, seven months after initial construction began, plaintiff claims that defendant issued a notice of new requirements to upgrade the courthouse's security measures. Plaintiff claims it informed defendant that these upgrades would "have an adverse impact on the Courthouse's overall construction because certain portions of the Courthouse could not progress until the proposed security modifications were installed." Nevertheless, defendant allegedly waited until February 23, 2006 to send plaintiff a "tentative" Statement of Work for the upgrade, and waited until April 1, 2006 to send out the initial Request for Proposal.[6] Plaintiff states that this Request for Proposal for the upgrades specified that it was not a Notice to Proceed.[7] Plaintiff allegedly sent an email to defendant on April 25, 2006, reminding defendant that "[t]his delay cost [sic] our company additional costs every day, so we will send you these costs and details of it later on." Plaintiff's amended complaint indicates that on May 13, 2006, plaintiff notified defendant of various construction delays due to defendant's alleged delays in issuing the security modification.

Security Request for Proposal was issued on May 23, 2006. Plaintiff indicates it submitted an updated cost estimate of $1,612,360.14 on June 3, 2006. After plaintiff's initial proposal was deemed "unacceptable," plaintiff alleges it submitted a revised proposal totaling $2,752,142.05, and was awarded the security upgrade modification on July 1, 2006. According to plaintiff, the total cost of the contract increased by $1,826,212.24 following award of the security upgrade modification. During defendant's alleged delay in developing the Security Request for Proposal, plaintiff claims it was unable to continue working on the courthouse and was unable to take on other work, alleging that it had to maintain all of its crew and equipment because the security modifications could have been approved at any time. Plaintiff's complaint alleges that the costs associated with the alleged delayed security upgrade modification totaled $2,068,780.00.[8]

Plaintiff's fourth alleged "difficulty" involved defendant's delay in authorizing repairs to the courthouse after, according to plaintiff, a November 2, 2006 friendly-fire incident by a United States Army Stryker, an American patrol operating nearby the work site, caused significant damage to the "substantially completed" courthouse. On November 13, 2006, plaintiff alleges it submitted to defendant its preliminary cost estimate of $175,601.00 to repair this damage. Plaintiff further alleges that defendant's Request for Proposal for the damages as a result of the friendly fire incident was sent out on December 20, 2006, to which, plaintiff submitted, on December 30, 2006, its proposal with the same estimate of $175,601.00. On January 14, 2007, plaintiff claims defendant unilaterally reduced the estimate by $58,000.00 to $117,508.00, which plaintiff re-

---

**5.** According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" two totaled $1,581,880.00.

**6.** Plaintiff alleges that the Request for Proposal for the security upgrades required plaintiff to submit its proposal no later than March 20, 2006, even though the Request was issued after March 20, 2006. Plaintiff argues that this made it impossible for plaintiff to comply with the Request for Proposal.

**7.** The April 1, 2006 Request for Proposal for the security modifications, submitted by defendant in its reply brief to plaintiff's opposition to defendant's motion to partially dismiss, states: "This is not a Notice to Proceed with this work and you are not to begin working on the above-described change until such time you receive a signed modification."

**8.** According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" three totaled $2,426,284.00.

fused, via email. After negotiations, plaintiff claims it submitted a revised cost estimate of $331,200.72 on April 17, 2007, which defendant claimed was too high. Ultimately, plaintiff accepted defendant's offer to perform the damage repair work for $250,000.00. Plaintiff maintains that the actual contract modification was not awarded until May 9, 2007,[9] 176 days[10] after the Stryker unit damage occurred. Plaintiff further maintains that it could have completed the repairs at a lower cost if defendant had authorized the repairs in January 2007, instead of delaying the approval until May 9, 2007.[11] Because of this delay, plaintiff maintains that it incurred costs associated with its remobilization efforts in order to perform the repairs called for in the modification. The amended complaint alleges that the costs for the fourth alleged "difficulty" totaled $409,488.00.

Plaintiff's fifth alleged "difficulty" involved defendant's delay in connecting the courthouse's electricity to the city's main electrical grid. Plaintiff maintains that it designed and installed the building's electrical system, but that it had no authority to connect the electrical system to the electrical grid. Rather, plaintiff maintains that only the defendant had the authority to coordinate with the Ministry of Electricity, because of the parties' agreement that plaintiff would not interact directly with the Iraqi agencies. Plaintiff claims it notified defendant of this problem on May 13, 2006. Defendant responded that the contract required plaintiff to perform all of the electrical connection work, including connecting the system to the area power grid. Plaintiff claims defendant wrote an email to plaintiff that it was plaintiff who was to " '[d]esign and install a complete electrical distribution system for the area, including all transformers and substations.' " Plaintiff maintains, however, that Statement of Work

§ 2.1.8, did not require plaintiff to install either transformers or substations, nor did it instruct plaintiff to connect the power system to the city electrical grid. Statement of Work § 2.1.8 states:

> The CONTRACTOR shall conduct a complete site investigation and field verify in order to fully research and document the electrical power distribution system. The CONTRACTOR shall map out all existing conditions to include the location and capacity of the existing in service Iraqi local sub-station. With this information, the CONTRACTOR shall provide a complete design illustrating all existing and proposed new work for the complete restoration of the facility's primary electrical power distribution system. The CONTRACTOR shall provide the primary electrical power distribution system in accordance with the International Electromechanical Commission. Construction shall not begin until approval by SPCO [Sector Project Contracting Office] PROGRAM MANAGER. Upon approval of the design, the CONTRACTOR shall complete all work associated with the design in order to provide a comprehensive primary electrical power distribution system for all the Court Facility for their respective sites. The CONTRACTOR is responsible for all design and construction for aspects of a total and complete primary electrical power distribution system and the design process shall conform to the requirements outlined in **SECTION 1, PARA 3.0: SUBMITTALS** of this document.

(emphasis and capitalization in original).[12] Plaintiff states that, in September 2006, the parties met again and that defendant cited Statement of Work § 2.1.8.1 as the relevant

---

**9.** Although plaintiff alleges in its amended complaint that the modification was not issued until May 9, 2007, the date on the modification, attached to the original complaint is April 27, 2007, signed by Mr. Dublin for plaintiff and Susan Newby for the United States, as contracting officer, on May 9, 2007.

**10.** Plaintiff claims that there were 167 days between November 2, 2006 and April 27, 2007. In fact, there were 176 days. Plaintiff also maintains that there are 167 days between November 2,

2006 and May 9, 2007 when there were 188 days.

**11.** According to exhibit 2 attached to the amended complaint, the modification of the contract was approved on April 27, 2007.

**12.** Although plaintiff alleges it was prohibited from interacting directly with the Iraqi agencies, there is no basis for this allegation according to Statement of Work § 2.1.8.1.

clause of the contract placing all responsibility on plaintiff to connect the courthouse to the power grid. Statement of Work § 2.1.8.1 states:

> The CONTRACTOR shall provide for the connection into the existing Iraqi local substation. The power connection shall be installed in combination with and through an automatic transfer switch to the **EMERGENCY ELECTRICAL POWER GENERATOR** as described in **SECTION 1.2.3.3** of this document. The CONTRACTOR will coordinate directly with the Local Electrical Distribution and Generation Company as required for a complete installation electrical power distribution system that will support the Court Facility requirements. The intent is to utilize the national power grid as the main power supply and the **EMERGENCY ELECTRICAL POWER GENERATOR** as an electrical back up as described in **SECTION 1, PARA 2.3.**

(emphasis and capitalization in original). Plaintiff maintains that Statement of Work § 2.1.8.1 says nothing about coordinating with the Ministry of Electricity, and does not supersede defendant's directive not to directly contact Iraqi government offices. Plaintiff claims that it emailed defendant in April 2007, noting that it could not force the Iraqi government to " 'do what they don't want to do.' " Plaintiff contends that "the electrical connection to the courthouse had still not occurred" as of October 30, 2007. Plaintiff original complaint alleged the defendant's failure to act delayed plaintiff's construction efforts for 365 days, costing plaintiff $985,500.00,[13] which plaintiff altered in the amended complaint, claiming the delay in construction lasted 487 days at cost of $1,919,754.00 in damages.

Plaintiff's sixth alleged "difficulty" involved the results of defendant's improper modification of the contract, placing security responsibility on the Iraqi Ministry of Justice's Force Protection Security. On October 7, 2006, according to plaintiff, Procuring Contracting Office Program Manager, Sundus Ali, directed the Iraqi Ministry of Justice's Force Protection Security to take up residence at the construction site and provide security to the courthouse. Plaintiff maintains that the Force Protection Security guards prevented plaintiff's personnel from "freely accessing the site and performing work." As a result, plaintiff claims it was forced to obtain a separate location for its project office. Furthermore, plaintiff alleges that the guards "significantly damaged the site," forcing plaintiff to expend additional labor and materials to repair the damage. Plaintiff maintains that the defendant improperly modified the contract "when it directed the FPS [Force Protective Security] to take up residence at the construction site and provide security" because the Statement of Work directed that "[t]he CONTRACTOR is responsible for on-site security as necessary to ensure no un-authorized access to the site." (capitalization in original). Therefore, plaintiff alleges defendant is responsible for the costs that arose from the FPS guards' "misuse and neglect" of the construction site. The amended complaint alleges that these expenses totaled $699,567.00.[14]

Plaintiff's seventh alleged "difficulty" involved defendant's delay in turnover and acceptance of the courthouse and closeout of the contract. Plaintiff alleges that at a March 2007 meeting, defendant "did not know who the Courthouse's end use [sic] would be and who could 'sign-off' on the building." Plaintiff alleges that the Council of Judges finally accepted the completed courthouse on December 17, 2007. During the time between October 2006, when the Force Protective Security guards, allegedly, first occupied the courthouse, and December 2007, when the Council of Judges accepted the building, plaintiff claims that defendant repeatedly required it to return to the site to make repairs, clean the facility, and conduct site visits. In order to be able to respond to these requests, plaintiff alleges it had to maintain its staff and retain equipment on the site.

---

**13.** According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" five totaled $848,676.12.

**14.** According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" six totaled $2,591,044.92.

The amended complaint asserts that these costs totaled $412,160.00.[15]

Plaintiff raises, for the first time in the amended complaint, an allegation that defendant breached the covenant of good faith and fair dealing, which the court construes as plaintiff's eighth claim, by defendant's "numerous failures in executing its duties and responsibilities," which "unfairly frustrated the contract's purpose and disappointed Al–Juthoor's expectations," resulting in plaintiff not obtaining the contract's benefits. Specifically, plaintiff asserts that defendant "deliberately and consciously failed to discharge its duties to timely review Al–Juthoor's submissions and make decisions about needed modifications to the contract," "deliberately evaded its duty to coordinate with various Iraqi ministries and municipal entities," and "failed to properly educate and orient its constantly changing personnel to the details of the courthouse project," resulting in delays because these new people "did not know or understand the terms of the contract." Plaintiff asserts it is entitled to money damages for said breach, but leaves the specific amount to cover this eighth claim to be established at trial. Notwithstanding the amount to be determined at trial, in the amended complaint plaintiff "requests the Court award damages in the amount of at least **$8,061,647.00**, appropriate interest, attorney's fees, and the costs of this action." (emphasis in original).

Plaintiff argues that its claims are timely because the claims did not accrue until plaintiff knew that defendant would not pay for the delays. Plaintiff argues that its claims could not have accrued until, at the earliest, December 13, 2007, "because of the Government's non-performance." In the alternative, plaintiff argues that even if the claims accrued before July 26, 2007, the statute of limitations in 41 U.S.C. § 7103 was equitably tolled due to statements by Frank Kelly, the contracting officer who managed the negotiation of the security modification, and Wade Ricard, the Army Corps Resident Engineer at the Baghdad Station, in December 2007,

which thereby "induced Al–Juthoor to forego other remedies with a promise of payment."

After "principal construction had ended," plaintiff alleges that plaintiff's representative, Charley Patrick Dublin, emailed Frank Kelly and Wade Ricard at the contracting office, on December 13, 2007 to express his frustration and concern that plaintiff was being held "held hostage" regarding outstanding payments. According to plaintiff, Mr. Kelly responded by requesting a meeting with plaintiff, which occurred, but did not result in plaintiff receiving payment. On October 13, 2008, plaintiff alleges it followed up with Ronald Light, via email, the on outstanding payments. On December 24, 2008, the parties agreed to meet again and did so on January 21, 2009, but still no payment resulted. Plaintiff argues that it postponed pursuing claims because of representations made by Frank Kelly, Wade Ricard, and Contracting Officer Raymond Greenheck, that "the Government would timely compensate Al–Juthoor" and that plaintiff's "claims would be addressed before the close out of the contract." Plaintiff does not refer to any documents to support its assertions that these representations were made, other than a December 24, 2008 email from the contracting office stating "that the only items to be included in the final invoice would be the warranty work claims." Plaintiff further maintains that until defendant requested the final invoice,[16] plaintiff was unaware that defendant would not pay for the delays, which according to plaintiff, defendant had caused. Plaintiff reiterated that "Al–Juthoor was willing to forego legal and financial remedies for delays because of Frank Kelly and Wade Ricard's promises that the Government would timely compensate Al–Juthoor. Kelly and Ricard had stated that the Government would possibly make an immediate payment to Al–Juthoor if Al–Juthoor gave up its request for compensation arising from the Government's delay."

On July 26, 2013, plaintiff filed its certified claim with the contracting officer. The

---

**15.** According to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" seven totaled $180,000.00.

**16.** According to plaintiff, Raymond Greenheck allegedly requested a "final" invoice on March 27, 2009.

certified claim identified the five difficulties identified above, (1) $682,860.00 for damages allegedly caused by Army Corps' delay in obtaining necessary clearances from the Council of Judges; (2) $1,869,038.00 for damages allegedly caused by Army Corps' changing the site of the courthouse; (3) $2,068,780.00 for damages allegedly caused by Army Corps' delay in approving the new security system requirements; (4) $409,488.00 for damages allegedly caused by the delay in approving work to repair damage caused by the United States military; and (5) $985,500.00 for damages allegedly caused by the delay in coordinating the connecting of the building's electrical system with the main electrical grid with Iraqi Ministry of Electricity. No decision was issued by the contracting officer, and, therefore, the certified claim was deemed denied.

In response to plaintiff's claims in its amended complaint, defendant moved to dismiss the first five claims, which also are all included in plaintiff's amended complaint, pursuant to Rule 12(b)(6) (2015) of the Rules of the United States Court of Federal Claims (RCFC), for failure to state a claim, alleging that plaintiff's claims are barred by the statute of limitations in the CDA. Defendant asserts that the first five claims accrued more than six years prior to plaintiff filing its certified claim with the contracting officer on July 26, 2013, in violation of 41 U.S.C. § 7103(a)(4)(A) of the CDA.[17] Defendant argues that the following five claims for damages, corresponding to the first five "difficulties," are barred by the statute of limitations: (1) damages allegedly caused by defendant's delay in obtaining necessary clearances from the Council of Judges; (2) damages allegedly caused by defendant's changing the site of the courthouse; (3) damages allegedly caused by defendant's delay in approving the new security system requirements; (4) damages allegedly caused by the delay in approving work to repair damage caused by the friendly fire incident; and (5) damages allegedly caused by the delay in coordinating with Iraqi authorities for the connection of the building's electrical system to the main electrical grid. Defendant argues that these claims accrued "at the time the underlying events giving rise to the claim for damages occurred," because that is when the contractor "knew or should have known of all the events that fixed liability for the government," which according to defendant was before July 26, 2007.[18]

Defendant also challenges plaintiff's new claims alleged in the amended complaint, asserting that the cause of action for breach of the covenant of good faith and fair dealing, as well as the increased amount of damages for plaintiff's fifth claim for breach of contract should be dismissed for lack of subject matter jurisdiction, as these were not presented to the contracting officer in a certified claim requesting a final decision. Defendant rejects plaintiff's increased "fifth breach of contract claim" regarding the delay in connecting the courthouse's electrical system to the city's electrical grid. In both plaintiff's certified claim to the contracting officer and in the original complaint, plaintiff asserts it is entitled to $985,500.00 in damages for a 365-day delay in the electrical hookup, and now asserts this claim entitles plaintiff to $1,919,754.00 in damages. Defendant rejects

17. In its partial motion to dismiss the original complaint, defendant argued that the first five claims should be dismissed pursuant to RCFC 12(b)(1) (2015), for lack of subject matter jurisdiction based on the failure to comply with the statute of limitations. Subsequently, the United States Court of Appeals for the Federal Circuit issued Sikorsky Aircraft Corp. v. United States, 773 F.3d 1315 (Fed. Cir. 2014). In response to the court's Order to address the Sikorsky case, defendant conceded that "41 U.S.C. § 7103(a)(4)(A) was not a jurisdictional statute [sic] rendered this Court unable to dismiss Al-Juthoor's claims for lack of subject matter jurisdiction." Defendant, therefore, filed a notice to convert the partial motion to dismiss for lack of subject matter jurisdiction to a partial motion to dismiss for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6). Subsequently, plaintiff filed an amended complaint, and defendant has moved to partially dismiss the amended complaint for both lack of subject matter jurisdiction and failure to state a claim. Therefore, the earlier partial motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1) is moot.

18. Defendant does not raise a motion to dismiss for failure to state a claim regarding the statute of limitations regarding plaintiff's sixth and seventh claims.

this claim, not only because plaintiff does not offer an explanation for the increase, but also because the new claim amount is based on the same operative facts as the original claim and plaintiff was aware of all pertinent factors that would affect the claim amount at the time it accrued. Defendant, therefore, argues that since no new information has surfaced to justify an increased amount, the new claim should be disallowed. Defendant also maintains that plaintiff's claim for breach of the covenant of good faith and fair dealing, plaintiff's possible eighth claim, should not be permitted because it was never submitted to the contracting officer, nor did plaintiff make any allegation in its certified claim that defendant acted in "bad faith" or mention the word "fair" whatsoever. Defendant, therefore, also contends that this claim fails based on RCFC 12(b)(1) grounds for lack of subject matter jurisdiction. The parties have fully briefed the partial motion to dismiss and oral argument was held.

## DISCUSSION

### I. Statute of Limitations

Defendant argues that plaintiff's first five claims must be dismissed for failure to state a claim because the claims all accrued more than six years before plaintiff filed its certified claim with the contracting officer. A motion to dismiss under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted " 'is appropriate when the facts asserted by the claimant do not under the law entitle him [or her] to a remedy.' " Murdock v. United States, 103 Fed.Cl. 389, 394 (2012) (alterations in original) (quoting Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998)). In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2015); Fed. R. Civ. P. 8(a)(2) (2016); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) ("To avoid dismissal under RFCF [RCFC] 12(b)(6), a party

need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.' ") (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 127 S.Ct. 1955)). The United States Supreme Court in Twombly stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss [for failure to state a claim] does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") .... [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56, 570, 127 S.Ct. 1955 (footnote and other citations omitted; brackets and omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570, 127 S.Ct. 1955); Totes–Isotoner Corp. v. United States, 594 F.3d

1346, 1354–55 (Fed. Cir.), cert. denied, 562 U.S. 830, 131 S.Ct. 92, 178 L.Ed.2d 28 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557, 127 S.Ct. 1955)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006, 130 S.Ct. 3468, 177 L.Ed.2d 1056 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570, 127 S.Ct. 1955)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570, 127 S.Ct. 1955)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937, 129 S.Ct. 2878, 174 L.Ed.2d 580 (2009); Peninsula Grp. Capital Corp. v. United States, 93 Fed.Cl. 720, 726–27 (2010), appeal dismissed, 454 Fed.Appx. 900 (2011); Legal Aid Soc'y of New York v. United States, 92 Fed.Cl. 285, 292, 298, 298 n.14 (2010); Hall v. Bed Bath & Beyond, Inc., 705 F.3d 1357, 1362 (Fed. Cir. 2013) ("the factual allegations must 'raise a right to relief above the speculative level' and must cross 'the line from conceivable to plausible.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 127 S.Ct. 1955)).

■ When deciding whether a plaintiff has failed to state a claim upon which relief can be granted, the court assumes that the undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Cambridge v. United States, 558 F.3d at 1335 (citing Papasan v. Allain, 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)); Cary v. United States, 552 F.3d at 1376 (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); Anaheim Gardens v. United States,

444 F.3d 1309, 1315 (Fed. Cir.), reh'g denied (Fed. Cir. 2006); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000); Perez v. United States, 156 F.3d at 1370; Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). If a defendant or the court challenges jurisdiction or a plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Therefore, although the court must assume that the undisputed facts alleged in the complaint are true for the purposes of the motion to dismiss and draws all reasonable inferences in the plaintiffs' favor, the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis. See Ashcroft v. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)) (mere allegations of law and conclusions of fact are insufficient to support a claim).

■ Pursuant to the CDA, "[e]ach claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A); see Sikorsky Aircraft Corp. v. United States, 773 F.3d at 1320; see also Ford Motor Co. v. United States, 811 F.3d 1371, 1377 (Fed. Cir. 2016). As indicated by a Judge of this court, "[t]he six-year requirement set forth in the CDA is not a limit on the time in which a suit must be filed in this court; rather, the 'presentment period,' as it is also known, requires a contractor to file a written claim with the contracting officer within six years after the accrual of that claim." Uniglobe General Trading & Contracting Co., W.L.L. v. United

States, 107 Fed.Cl. 423, 430 (2012)[19] The Federal Circuit in Sikorsky explained that:

A claim accrues as of "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred."

Sikorsky Aircraft Corp. v. United States, 773 F.3d at 1320 (quoting 48 C.F.R. § 33.201).

On July 26, 2013, plaintiff submitted its certified claims to the contracting officer alleging that defendant owed plaintiff a total of $7,127,393.00 in damages, not including interest. It is not in dispute when the events surrounding the alleged "difficulties" took place. At the time plaintiff originally filed suit in this court on January 2, 2014, the contracting officer still had not issued a decision on plaintiff's claims. On September 15, 2015, plaintiff filed an amended complaint with this court that alleged seven breach of contract claims against Army Corps, as well as a general claim for breach of the covenant of good faith and fair dealing. As noted above, plaintiff's claims for breach of contract include: (1) failure to compensate plaintiff for the costs and delays incurred for the Army Corps' issuing of three Notices to Proceed; (2) a two-part claim for failure to compensate plaintiff for Army Corps' unilateral decision to change the location of the courthouse after preparations were made by plaintiff at the original site location and for failing to compensate plaintiff for the additional fill and foundation work needed at the second construction site; (3) failure to compensate for the delays (more than 120 days) incurred when Army Corps did not approve necessary security upgrade modifications; (4) failure to compensate plaintiff for delays incurred when Army Corps failed to approve of the military damage modification for 167 days; (5) failure to coordinate with the Iraqi Ministry of Electricity to connect the courthouse to the city's electrical grid and alleging that the government was the only party with authority to communicate with the Ministry, thereby, delaying work for more than a year; (6) permitting the Iraqi Ministry of Justice to install a security service in the courthouse, resulting in damage to the courthouse and displacement of plaintiff from on-site offices, mandating that plaintiff move to an alternate office, and delaying plaintiff's ability to turn over the courthouse; and (7) failure to coordinate the final inspection and turnover of the courthouse to the Iraqi Council of Judges. The Amended Complaint added an allegation of breach of the covenant of good faith and fair dealing; and added damages in the amount of $1,919,754.00 for the fifth claim for a 487–day delay in coordinating the hookup of the facility's electricity to the city's electrical grid, increased from a 365–day delay alleged in the original complaint and in the certified claim submitted to the contracting officer. Therefore, the plaintiff now seeks an additional $934,254.00 in damages, bringing the amount of damages claimed in the amended complaint to $8,061,647.00.

As noted above, defendant contends that this suit must be partially dismissed regarding claims one through five, for failure to satisfy the six-year statute of limitations, in 41 U.S.C. § 7103(a)(4) because when plaintiff filed its claims with the contracting officer on July 26, 2013, it was more than six years after the first five claims alleged in plaintiff's complaint accrued. Defendant argues that plaintiff knew or should have known about the costs incurred for each of the first five claims, and part of the sixth claim, on or before July 26, 2007. In response, plaintiff asserts that its claims could not have accrued until at least December 11, 2007, when one of plaintiff's representatives emailed representatives for defendant accusing "the Government of holding Al–Juthoor hostage because the Government would neither remit payments for changes nor work completed," which, according to plaintiff, would be within

---

19. The Judge in Uniglobe cited to 41 U.S.C. § 605, the predecessor to 41 U.S.C. § 7103. See Uniglobe General Trading & Contracting Co., W.L.L. v. United States, 107 Fed.Cl. at 430. Public Law No. 111–350 was signed into law on January 4, 2011, reorganizing Title 41 of the United States Code. See Act of Jan. 4, 2011, Pub. L. No. 111–350, 124 Stat. 3677 (2011). As a result, 41 U.S.C. §§ 601–13 of the Contract Disputes Act of 1978 has been reorganized into 41 U.S.C. §§ 7101–09.

the six years prior to plaintiff's submission of its claim to the contracting officer. Plaintiff argues that this is the earliest that it knew or should have known that defendant was not going to pay for delays it allegedly caused, because of the possibility that the government could change its mind and pay for the delays is a reasonable basis for deciding a claim had not accrued. According to plaintiff, prior to this date, plaintiff relied on defendant's representations that "the Government would timely compensate Al–Juthoor" and that plaintiff's "claims would be addressed before the close out of the contract," which caused plaintiff to refrain from taking earlier action on its claims. Relying on Arakaki v. United States, 62 Fed.Cl. 244 (2004), plaintiff argues that sufficient notice of a government act, which allegedly creates liability, may be defined differently according to the context in which the claim arises, and that "[i]n payment cases, the claim does not accrue until the government communicates its intent not [to] pay."

Plaintiff also argues that "Al–Juthoor's claims could not have immediately accrued on the last day of any particular delay period because of the multitude of administrative steps required by the Government for Al–Juthoor to substantiate a claim for payment." These steps included contract modifications and requests for equitable adjustments. Plaintiff relies on Franconia Associates v. United States, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002), which held:

> "The time of accrual ... depends on whether the injured party chooses to treat the ... repudiation as a present breach." ... If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election." ... But if the injured party instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation."

Id. at 144, 122 S.Ct. 1993 (quoting 1 C. Corman, Limitation of Actions § 7.2.1, p. 488–89 (1991)). Plaintiff claims that it "opted

to await the Government's performance because of the multiple representations by the contracting office that Al–Juthoor's claims would be addressed."

In response, defendant asserts that a contractor's claim has "accrued" for the CDA statute of limitations purposes at the time the underlying events gave rise to the claim for damages, because that is when "all events that fix the alleged liability" of either the Government or the contractor that permit assertion of the claim, "[were known] or should have [been] known," regardless of continued communications or negotiations between the parties. (citing 48 C.F.R. § 33.201). Defendant contends that plaintiff failed to comply with statutory requisites for filing suit under the CDA because plaintiff fundamentally misunderstands the "nature of 'accrual' in the context of 41 U.S.C. § 7103(a)(4)."

■ For claim one, the court concludes that plaintiff should have been aware that damages would be incurred from the final Notice to Proceed on May 21, 2005 at the latest, when it was apparent that defendant was ordering plaintiff to begin work on the site without clearance from the Iraqi government. At minimum, plaintiff should have known in the 37–day period between the first and final Notices to Proceed, the time during which plaintiff waited for permission to begin work after fully mobilizing its workers and equipment, that some injury had occurred for which plaintiff would seek to recover damages. Therefore, this claim is barred by the statute of limitations.

■ For claim two, plaintiff knew or should have known of the facts underlying this claim by November 27, 2005, the date when plaintiff claims it made defendant aware of the additional expenses that it had incurred due to defendant's changing the site of the courthouse. Thus, this claim accrued before July 26, 2007, and is barred by the statute of limitations.

■ For claim three, plaintiff seeks compensation for delays that occurred as a result of security upgrades between December 2005, when "USACE [United States Army Corps of Engineers] notified Al–Juthoor of a

new requirement to upgrade the Courthouse's security measures," and July 1, 2006, when the defendant awarded the security upgrade modification to plaintiff. Plaintiff knew or should have known that it would incur significant costs when it notified defendant of the adverse impact on the construction schedule and how construction on certain portions of the courthouse could not continue until the security modifications were installed. Plaintiff, certainly, should have known by July 1, 2006, the date when the security upgrade was awarded, that it incurred costs due to defendant's alleged delay in approving the new security upgrades to the courthouse, thus, this claim is barred by the statute of limitations.

■ For claim four, plaintiff knew or should have known by May 9, 2007, that it had incurred costs due to defendant's alleged delay in authorizing repairs due to the November 2, 2006 friendly-fire incident when the repair modification was finally issued after months of discussions and reductions to plaintiff's initial $175,601.00 cost estimate. This claim also accrued more than six years prior to when the certified claim was submitted to the contracting officer. Accordingly, the plaintiff's fourth claim is barred by the statute of limitations.

■ Finally, for claim five, plaintiff knew or should have known by May 13, 2006 when it sent defendant a letter titled "Problems Causing Delay," explaining the delay in connecting the courthouse to the city electrical grid and explaining that plaintiff had incurred costs due to defendant's alleged delay in connecting the courthouse's electricity to the city's main electrical grid. Certainly by May 18, 2007, when plaintiff asserts defendant began coordinating with the Ministry of Electricity. Therefore, plaintiff's first five claims each accrued before July 26, 2007, six years before the certified claim was submitted to the contracting officer on July 26, 2013, because it was before that date that plaintiff knew or should have known of the events that gave rise to the costs incurred for those claims. Therefore, plaintiff's first five claims are barred by the statute of limita-

tions included in 41 U.S.C. § 7103(a)(4)(A), and are, hereby, dismissed for failure to state a claim.

■ Although not challenged by defendant in its partial motion to dismiss, the court examines the timeliness of plaintiff's sixth and seventh claims. Plaintiff's sixth claim is that it is entitled to damages allegedly caused by defendant's improper modification of the contract. Plaintiff alleges that on October 7, 2006, defendant directed the Iraqi Ministry of Justice's Force Protection Security to take up residence at the construction site and begin providing security to the courthouse. Plaintiff maintains that it incurred costs due to the guards preventing plaintiff's personnel from "freely accessing the site and performing work," and in repairing the damage allegedly caused by the guards during the guards' occupation of the courthouse site. Plaintiff claims that according to the Statement of Work only its personnel would occupy the site and be responsible for the site's security, and, therefore, this was an improper modification of the contract.[20] Plaintiff alleges that "[t]he COJ [Council of Judges] finally accepted the completed Courthouse on December 17, 2007."

■ Finally, plaintiff's seventh claim is that it is entitled to damages allegedly caused by defendant's delay in closing out the contract. Plaintiff alleges that during the time between October 2006, when the Force Protective Security guards first occupied the courthouse, and December 17, 2007, when the Council of Judges accepted the completed building, defendant repeatedly required it to return to the site to make repairs, clean the facility, and conduct site visits. Therefore, events surrounding plaintiff's sixth and seventh claims affixing liability to the government occurred, at the earliest, on December 17, 2007. It was on this date that plaintiff knew or should have known of the events that gave rise to the claim for damages affixing liability for the government. See 48 C.F.R. § 33.201 (2016). Since the sixth and seventh claims accrued after July 26, 2007, less than six years prior to plaintiff filing its

---

20. Statement of Work § 5.3 states: "The CONTRACTOR is responsible for on-site security as necessary to ensure no un-authorized access to the site." (capitalization in original).

certified claims with the contracting officer, the sixth and seventh claims comply with the statutory requirements of 41 U.S.C. § 7103(a)(4)(A).

## II. Equitable Tolling

Although the court has determined that the first five claim accrued more than six years before the plaintiff filed the certified claims with the contracting officer, according to applicable precedent, the CDA statute of limitations can be subject to equitable tolling. See Arctic Slope Native Ass'n, Ltd. v. Sebelius, 583 F.3d 785, 798 (Fed. Cir.) ("Congress intended equitable tolling to be available unless there is good reason to believe otherwise. Unlike in the case of section 2501, there is no long history of case law holding that the time limitation of section 605(a) [now section 7103] is absolute . . . ."), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1026, 130 S.Ct. 3505, 177 L.Ed.2d 1091 (2010); see also Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519, 523, 529–31 (D.C. Cir. 2010) (following Arctic Slope Native Ass'n, Ltd. v. Sebelius in concluding that section 7103 is subject to tolling). Nonetheless, "equitable tolling against the federal government is a narrow doctrine." Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003); see also Kosmo v. United States, 72 Fed.Cl. 46, 55 (2006) ("It is well established that equitable tolling must be strictly construed." (citations omitted)). The Supreme Court has held that "mere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as 'where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" Martinez v. United States, 333 F.3d at 1318 (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). Furthermore, "[t]he mere continuance of negotiations . . . constitutes no reason to extend the limitations period.'" Brighton Vill. Assocs. v. United States, 52 F.3d 1056, 1061 (Fed. Cir. 1995) (citations omitted).

Plaintiff argues that even if the first five claims accrued before July 26, 2007, its claims should be considered timely because the statute of limitations should be equitably tolled. Plaintiff contends that "equitable tolling is permitted when a claimant has actively pursued judicial remedies by filing a defective pleading during the statutory period or where the claimant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Plaintiff asserts that it postponed pursuing claims because of representations made in December 2007 by Frank Kelly, Wade Ricard, and Raymond Greenheck, individuals in the defendant's contracting office, that plaintiff's claims would be addressed before the close of the contract. Plaintiff claims that statements made by these individuals amounted to "induce[ment of plaintiff] to forego other remedies with a promise of payment," and plaintiff should not be penalized for the time it waited to see if the Government would pay the delay claims. Additionally, plaintiff asserts its claims were timely because the "CDA requires the contracting officer to respond and the contractor to receive the response in order for the limitation clock to start," and that plaintiff never got a response from the contracting officer regarding any costs or modifications until December 2007. Plaintiff further maintains that until defendant requested a final invoice on March 27, 2009, plaintiff was unaware that defendant would not pay for the delays it allegedly had caused.

Defendant argues that plaintiff is not entitled to equitable tolling of its claims in this case. Defendant, quoting Raytheon v. United States, 104 Fed.Cl. 327, 331–32 (2012), contends that "'[e]quitable tolling is an exception similar to accrual suspension in that it addresses instances of unfairness where misconduct by a party is evident; it requires a showing of compelling justification amounting to misconduct,'" such as trickery or inducement, which plaintiff fails to do. Defendant asserts that the only written communication from either Frank Kelly or Wade Ricard in December 2007 produced by plaintiff to this court is a single email form Mr. Kelly responding to an email from Mr. Dublin, plaintiff's General Manager of Iraq Operations, which scheduled a meeting without mentioning any outstanding pay-

ment obligations. Defendant also relies on United States Supreme Court precedent, citing Irwin v. Department of Veterans Affairs, 498 U.S. at 96, 111 S.Ct. 453, which indicates that equitable tolling does not apply when "the claimant failed to exercise due diligence in preserving [its] legal rights," which defendant argues is what occurred here. Id. at 96, 111 S.Ct. 453.

 After reviewing the record before the court, there no evidence of any government misconduct that would warrant equitable tolling. Although plaintiff claims that it relied on statements made by defendant's representatives in the contracting office, specifically that "[t]he statements of Frank Kelly and Wade Ricard in December 2007 induced Al–Juthoor to forego other remedies with a promise of payment," the statements that plaintiff attempts to rely on do not suggest the government induced plaintiff to forego legal action. From December 2007 to March 2009, defendant requested meetings to discuss the continued negotiations of the claims. On December 13, 2007, Frank Kelly "scheduled a meeting between you [Al–Juthoor] and our Commander," but made no promises of payment. On October 14, 2008, Colonel Ronald Light wrote to plaintiff regarding payment, informing plaintiff that "I have asked my team to research the details in this matter," but again made no promises of payment. On October 20, 2008, Cheri Jordan, "the contracting officer responsible for" processing the requests for payment, emailed plaintiff informing it that "we will be arranging a meeting in the near future to discuss your concerns," but, again, made no promises of payment. On January 19, 2009, Raymond Greenheck wrote to plaintiff, "Please submit your invoice ... at this time." On March 27, 2009, Contracting Officer Greenheck again wrote to plaintiff to "[p]lease send in your invoice." In none of the emails contained in the record before the court did any of defendant's representatives promise to pay for the incurred costs. Because there is no evidence of government misconduct, there is no compelling reason to justify granting equitable tolling of the CDA's six-year statute of limitations in 41 U.S.C. § 7103(a)(4)(A) in the above captioned case.

## III. Jurisdiction over the Claims Added Amended Complaint

### A. Presentation

 Defendant also argues that the court should dismiss plaintiff's claims added to the amended complaint "for lack of subject matter jurisdiction, as these claims were not presented as part of Al–Juthoor's certified claim to the contracting officer." It is well established that " 'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.' " Arbaugh v. Y & H Corp., 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011); see also Gonzalez v. Thaler, 565 U.S. 134, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514, 126 S.Ct. 1235)); Special Devices. Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case.") (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Svs., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., —— U.S.

——, 133 S.Ct. 817, 824, 184 L.Ed.2d 627 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506, 126 S.Ct. 1235 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07, 126 S.Ct. 1235)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506, 126 S.Ct. 1235; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed.Cl. 71, 76, appeal dismissed, 425 Fed. Appx. 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 58 (1998)), reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975, 126 S.Ct. 543, 163 L.Ed.2d 458 (2005), cert. dismissed as improvidently granted, 548 U.S. 124, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 562 U.S. 1169, 131 S.Ct. 909, 178 L.Ed.2d 804 (2011).

Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2); Fed. R. Civ. P. 8(a)(1), (2); see also Ashcroft v. Iqbal, 556 U.S. at 677–78, 129 S.Ct. 1937 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570, 127 S.Ct. 1955). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed.Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed.Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d at 1363 n.9. "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.' " Three S Consulting v. United States, 104 Fed.Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 127 S.Ct. 1955), aff'd, 562 Fed.Appx. 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Ashcroft v. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render

judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90, 129 S.Ct. 1547, 173 L.Ed.2d 429 (2009); United States v. Mitchell, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir, 1999).

 "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216, 103 S.Ct. 2961; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, —— U.S. ——, 134 S.Ct. 259, 187 L.Ed.2d 262 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed.Cl. 764, 768 (2014). In Ontario Power Generation. Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

> The underlying monetary claims are of three types . . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver . . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct.Cl. 599, 605–06,] 372 F.2d [1002,] 1007–08 [ (1967) ] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket' " (quoting Clapp v. United States. 127 Ct.Cl. 505, 117 F.Supp. 576, 580 (1954)). . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v.] Testan, 424 U.S. [392,] 401–02, 96 S.Ct. 948 [47 L.Ed.2d 114] [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation. Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed.Cl. 101, 106 (2012).

 To prove that a statute or regulation is money-mandating, a plaintiff must

demonstrate that an independent source of substantive law relied upon " 'can fairly be interpreted as mandating compensation by the Federal Government.' " United States v. Navajo Nation, 556 U.S. at 290, 129 S.Ct. 1547 (quoting United States v. Testan, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472, 123 S.Ct. 1126; United States v. Mitchell, 463 U.S. at 217, 103 S.Ct. 2961; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153, 129 S.Ct. 1038, 173 L.Ed.2d 468 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290, 129 S.Ct. 1547 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[ ] that operate [s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts).")." " 'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.' " Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed.Cl. 553, 565–66 (2009).

▮ "Under the Contract Disputes Act (CDA), the [Court of Federal Claims] does not have jurisdiction over claims which a contractor has failed to present to the agency's contracting officer. AAI Corp. v. United States, 22 Cl.Ct. 541, 544 (1991). Claims of more than $ 50,000.00 must be certified by the contractor. See W.M. Schlosser Co. v. United States, 705 F.2d 1336, 1338 (Fed. Cir. 1983); 41 U.S.C. § 605(c). "In enacting the CDA, 'Congress required contractors to file all claims with the contracting officer to provide the Government with an opportunity to settle the case or otherwise avoid unnecessary litigation.' " AAI Corp. v. United States, 22 Cl.Ct. 541 (1991) citing SMS Data Products Grp., Inc. v. United States, 19 Cl.Ct. 612, 614 (1990). Under certain circumstances however, "on appeal . . . . in a direct access action in the Claims Court, a contractor may increase the amount of his claim . . . ." Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858· (Fed. Cir. 1987). "The excess quantum must, however, spring from the same certified claim. Plaintiff may not seek damages for a new claim—a claim not yet submitted to and decided by the contracting officer." Tecom, Inc. v. United States, 732 F.2d 935, 937–38 (Fed. Cir. 1984). This court has jurisdiction over an increased claim if "the increase in the amount of the claim is based on the same set of operative facts previously presented to the contracting officer" and "the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim." Kunz Constr. Co. v. United States, 12 Cl.Ct. 74, 79 (1987); see also Cerberonics, Inc. v. United States, 13 Cl.Ct. 415, 417 (1987) (; J.F. Shea Co., Inc. v. United States, 4 Cl.Ct. 46, 54–55 (1983). In Modeer v. United States, the court explained that "if the dollar value of a claim increases *based on new information available only after the claim was submitted to the contracting officer*," the plaintiff was entitled to increased damages that "[arose] from the same operative facts as the original claim and claims the same categories of relief." 68 Fed.Cl. 131, 137 (2005) (emphasis added), aff'd, 183 Fed.Appx. 975 (Fed. Cir. 2006) (citing Cerberonics, Inc. v. United States, 13 Cl.Ct. 415, 418 (1987); see Baha v. United States, 123 Fed.Cl. 1, 6 (2015) (finding damages for unpaid rent accruing for consecutive three months after claim was submitted to contracting officer arose. from "same operative facts" and were permissible).

Plaintiff originally claimed defendant's failure to act to assist in connecting the courthouse to the local electrical grid delayed plaintiff's construction efforts for 365 days, costing $985,500.00,[21] which dollar figure

---

21. As noted above, according to plaintiff's December 28, 2011 Request for Equitable Adjustment, the costs for "difficulty" five totaled $848,676.12.

plaintiff altered in the amended complaint, claiming the delay in construction lasted 487 days at cost of $1,919,754.00 in damages. Plaintiff contends that when "the Court compares the allegations of the Amended Complaint to the facts presented in the demand letter, the Court will see that the claims arise from the same set of operative facts," as it "placed all of the elements of this claim before the contracting officer on several different occasions." Specifically, plaintiff notes that the defendant "has always known of the problems associated with getting the courthouse connected to the municipal electrical grid." Plaintiff claims to have amended its original complaint because after "diligently review[ing] documents and government correspondence" with the court's permission, it should not be penalized for finding documents that "support and clarify its claims" in doing so. Plaintiff asserts that this increased dollar claim should survive because the claim is based upon the same "theory of recovery," and only alters the alleged length of delay and the amount of damages requested.

Defendant, citing D.L. Braughler Co., Inc. v. West, 127 F.3d 1476, 1480 (Fed. Cir. 1997), argues that the court lacks jurisdiction over the new claims because plaintiff failed to include the claims in its July 26, 2013 certified claim or otherwise present the claims to the contracting officer for a final decision, violating the exhaustion requirements under the CDA. Specifically, defendant argues that plaintiff's amended breach of contract claim stemming from the delayed security modification relies on different factual allegations and an "entirely separate theory of recovery" than what plaintiff raised to the contracting officer and alleged in the original complaint. Defendant also argues that plaintiff's increased claim for breach surrounding the connection of the courthouse to the city's electrical grid, which increased the claim from $985,500.00 in the original complaint, to $1,919,754.00, is unwarranted, as it stems from different operative facts than the original claim, and that plaintiff offers no new information or explanation for the increased claim amount.

██ The court agrees that plaintiff's claim in its amended complaint, asking for an increased amount for the security modification claim may stem from the "same operative facts" as those submitted in the original claim to the contracting officer. Moreover, plaintiff fails to address how the elongated duration and increased claim amount for security modification delay set forth in the amended complaint were based on facts that were not known, nor reasonably should have been known to plaintiff. Nor can plaintiff demonstrate that new facts arose subsequent to filing its claim with the contracting officer in order to prove that defendant's alleged 365–day delay in coordinating the hook-up of the courthouse to the city's electrical grid should be increased by 122 days and $934,754.00. Plaintiff asserts that it should not be penalized for diligently reviewing documents pursuant to this court's Order and finding additional supporting materials for this claim, which suggests that the information may have been available to plaintiff if plaintiff had diligently searched the documents prior to the time plaintiff filed its claim with the contracting officer. More importantly, plaintiff has offered the court nothing to support its increased claimed dollar amounts, or that these increased claimed dollar values are founded on the same operative facts as the certified claim submitted to the contracting officer. Thus, the court lacks jurisdiction over plaintiff's increased claimed amounts because the facts that would form the basis for the newly claimed dollar amounts were known or should have been known to plaintiff at the time of filing its claims with the contracting officer and when plaintiff filed its original complaint.

### B. Good Faith and Fair Dealing Claim

While the claim for breach of the covenant of good faith and fair dealing is not challenged by defendant on the grounds of failure to state a claim upon which relief can be granted under RCFC 12(b)(6), this court is required to do such an analysis when a claim is so vaguely pleaded that the court is unable to decide the issues raised based on the facts asserted in the complaint. As noted above, a motion to dismiss under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted " 'is appropriate when the facts asserted by the claimant do not under the

law entitle him [or her] to a remedy.'" <u>Murdock v. United States</u>, 103 Fed.Cl. at 394 (alterations in original) (quoting <u>Perez v. United States</u>, 156 F.3d at 1370). Plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); Fed. R. Civ. P. 8(a)(2); <u>see also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555, 127 S.Ct. 1955; <u>TrinCo Inv. Co. v. United States</u>, 722 F.3d at 1380. The United States Supreme Court in <u>Twombly</u> stated that: "'[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570, 127 S.Ct. 1955; <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678, 129 S.Ct. 1937 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555–57, 570, 127 S.Ct. 1955); <u>Totes–Isotoner Corp. v. United States</u>, 594 F.3d at 1354–55; <u>Bank of Guam v. United States</u>, 578 F.3d at 1326. Although the court must assume that the undisputed facts alleged in the complaint are true for the purposes of the motion to dismiss and draws all reasonable inferences in the plaintiffs' favor, the facts alleged in the complaint must be plausible and not merely naked assertions devoid of a factual basis. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678, 129 S.Ct. 1937; <u>see also</u> <u>McZeal v. Sprint Nextel Corp.</u>, 501 F.3d at 1363 n.9 (mere allegations of law and conclusions of fact are insufficient to support a claim).

Plaintiff's allegation of defendant's breach of the covenant of good faith and fair dealing, added in plaintiff's amended complaint, and construed by the court as plaintiff's eighth possible claim, is so vaguely pleaded in the amended complaint and specifies little to no facts to support the claim. While the pleading standards are flexible, plaintiff fails to point to any particular events or facts that would allow this claim to succeed. Rather, the amended complaint uses only broad statements to assert that the defendant's numerous failures "in executing its duties and responsibilities unfairly frustrated the contract's purpose and disappointed [plaintiff's] expectations," simply reciting the elements necessary to prove the breach. While plaintiff is not required to lay out every inkling of factual evidence to prove this claim, plaintiff must set forth facts specific enough that would indicate the claim is plausible on its face, which plaintiff fails to do here. Because plaintiff makes only "naked assertions devoid of a factual basis," <u>see</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678, 129 S.Ct. 1937, plaintiff has failed to state a claim upon which this court can grant relief, thus, this eighth claim, set forth in plaintiff's amended complaint, must be dismissed.

## CONCLUSION

Although the court is not without sympathy to the position in which plaintiff finds itself, plaintiff has been given many opportunities by this court to document and perfect its claims, and, therefore, for the reasons discussed above, the court **GRANT** defendant's partial motion to dismiss. The Clerk of the Court shall **DISMISS** the first five claims filed by plaintiff, and **DISMISS** the eighth claim for breach of the covenant of good faith and fair dealing added in the amended complaint. Claim 6, regarding the of defendant's improper modification of the contract, and claim 7, regarding defendant's delay in turnover and acceptance of the courthouse and closeout of the contract, survive.

**IT IS SO ORDERED.**